**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

MARGARET HALL,

    Plaintiff,

v.                                                     Case No. 8:23-CV-1176-KKM-TGW

SANOFI-AVENTIS U.S. LLC,
and SANOFI US SERVICES, INC.

    Defendants.

_____/

**PLAINTIFF'S RESPONSE IN OPPOSITION TO SANOFI U.S. LLC AND SANOFI US SERVICES, INC.'S MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW**

    Neither the statute of limitations nor learned intermediary doctrine warrant summary judgment in this case.

    Ms. Hall could not have reasonably discovered facts giving rise to her cause of action until approximately 2016 when she saw a television advertisement regarding Taxotere lawsuits and began to understand that Taxotere, specifically, had caused her to experience *permanent* hair loss. Sanofi did not disclose to the public Taxotere's risk of permanent hair loss until December 2015, so an examination of the Taxotere labeling would not have revealed any information about this risk prior to December 2015. Ms. Hall filed her lawsuit against Sanofi less than four years after she realized Taxotere had caused her permanent hair loss and the date on which Sanofi finally changed its Taxotere labeling to warn of permanent hair loss; therefore, her case was timely filed.

    The learned intermediary doctrine also does not justify summary judgment in Ms. Hall's case. Ms. Hall's oncologist, Dr. Auerbach would have conveyed the risk of permanent hair loss

1

if Sanofi had given him that information. If aware of that risk, Ms. Hall would have requested other chemotherapy options and would have chosen an equally effective alternative option. Finally, Dr. Auerbach would have prescribed Adriamycin instead of Taxotere if Ms. Hall had requested a non-Taxotere regimen. Therefore, Ms. Hall has established proximate causation under the learned intermediary doctrine.

## RESPONSE TO SANOFI'S STATEMENT OF ADDITIONAL MATERIAL FACTS

| | Sanofi's additional facts and citations | Plaintiff's Response and Supporting Evidence |
|---|---|---|
| 1. | Taxotere was first approved for use in the United States in 1996, and its FDA-approved labeling has always warned that hair loss is one of the drug's most common side effects. Compare Def. Ex. A, 1996 Taxotere Labeling, with Def. Ex. B, 2018 Taxotere Labeling. | This statement is incomplete and misleading. Taxotere's labeling warned of "alopecia" and has always contained the following language: "Loss of hair occurs in most patients taking Taxotere (including the hair on your head, underarm hair, pubic hair, eyebrows, and eyelashes). Hair loss will begin after the first few treatments and varies from patient to patient. Once you have completed all your treatments, hair generally grows back." Def. Ex. A, 1996 Taxotere Labeling. |
| 2. | In December 2015 Sanofi, after discussions with FDA, added the following language to the post-marketing section of Taxotere's package insert: "cases of permanent alopecia have been reported." Def. Ex. C, 2015 Taxotere Labeling. | This statement is incomplete and misleading. In October 2015, the Food and Drug Administration ("FDA") directed Sanofi to update its Taxotere labeling to "provide any additional information regarding permanent or irreversible alopecia." Ex. H[1], FDA Supplemental Request. In December 2015, pursuant to the FDA's directive, Sanofi added the following language to the post-marketing section of Taxotere's package insert: "cases of permanent alopecia have been reported.". Def. Ex. C, 2015 Taxotere Labeling. |

---

[1] Plaintiff will begin her Exhibit designations with "H" to avoid confusion with Sanofi's exhibits.

| | **Sanofi's additional facts and citations** | **Plaintiff's Response and Supporting Evidence** |
|---|---|---|
| 3. | Ms. Hall alleges that she developed "Permanent Chemotherapy Induced Alopecia," which she defines as "an absence of or incomplete hair regrowth six months beyond the completion of chemotherapy." First Amended Master Complaint, Doc. 5-11 ¶ 180; Short Form Complaint ("SFC"), Doc. 1 at 1 (adopting allegations of First Amended Master Complaint), ¶ 5 (alleging Ms. Hall was injured in Florida). | Denied. The MDL First Amended Master Complaint states "[u]nlike the temporary and reversible alopecia that ordinarily results from chemotherapy, Taxotere…cause[s] Permanent Chemotherapy Induced Alopecia, which is defined as an absence of or incomplete hair regrowth six months beyond the completion of chemotherapy." Doc. 5-11 at ¶180. Ms. Hall is not even familiar with the term "Permanent Chemotherapy Induced Alopecia," so she certainly does not know its definition or whether alopecia is considered permanent six months after chemotherapy completion. *See* Pl. Ex. I, Hall Dep. at 215:5-7.<br><br>In fact, the definition of "permanent alopecia" is not nearly as straightforward as Sanofi claims in this statement. Sanofi's own Global Safety Officer, Dr. Emanuel Palatinsky, testified that it is difficult to define "permanent alopecia," but that it was a reasonable assumption that alopecia lasting more than four years was permanent. Ex. J, Palatinski Dep. at 444:22-445:3, 450:25-451:6**.** Even under this assumption, Dr. Palatinsky testified that he preferred to use "persistent" instead of "permanent" because it is difficult to know the ultimate outcome, only that the hair loss is "ongoing." *See* Ex. J, Palatinsky Dep. at 449:1-7, 455:1-456:25. |
| 4. | Ms. Hall alleges she began to experience permanent alopecia by December 24, 2010, six months after she completed chemotherapy treatment on June 24, 2010. First Amended Master Complaint, Doc. 5-11 ¶ 180; SFC, Doc. 1 ¶ 10. | Denied. Ms. Hall alleged that she "experienced hair loss on my head and body after being administered taxotere and my hair has not grown back." Short Form Complaint at ¶12. |
| 5. | Ms. Hall felt that there was "no other reason" but chemotherapy for the loss of her eyebrows. Def. Ex. D, Hall Dep. at 105:13–106:1. | This statement is incomplete and misleading.<br><br>*At the time she hired an attorney and filed her lawsuit against Sanofi*, Ms. Hall felt that there was "no other reason" but chemotherapy for the loss of her eyebrows. Ex. I, Hall Dep. at 100:18-101:1, 102:11-13, 103:18-104:11, 105:1-106:1. |

3

| **Sanofi's additional facts and citations** | **Plaintiff's Response and Supporting Evidence** |
|---|---|
| 6. The hair on Ms. Hall's scalp, for example, began to regrow approximately two months after she completed chemotherapy. Def. Ex. D, Hall Dep. at 203:12–24. | Denied. Ms. Hall testified that she had a retirement party a month or two after she retired. Ex. I, Hall Dep. at 203:17-24. She testified that she retired in October or November of 2010. *Id.* at 209:6-15. None of this testimony established when her hair began to regrow. However, Ms. Hall did testify that she remembered she still wore her wig at the time of her retirement party. *Id.* at 209:16-19. |
| 7. The hair on Ms. Hall's scalp regrew fully, although thinner, approximately a year after chemotherapy, which she believes "in retrospect" should be part of her claim in this lawsuit. Def. Ex. D, Hall Dep. at 186:19–187:19; 213:18–214:7. | This statement is incomplete and misleading. Ms. Hall testified that her hair "almost" grew back to the way it was before chemotherapy approximately a year after completing chemotherapy. Def. Ex. D, Hall Dep. at 213:18–214:7. Photographs from before and after chemotherapy demonstrate that her hair did not regrow fully, and this injury was alleged in her complaint. Ex. K, Before and After Photographs. |
| 8. Approximately one year after chemotherapy, Ms. Hall realized that her eyebrows were not going to come back. Def. Ex. D, Hall Dep. at 211:16–212:6. | Denied. Ms. Hall testified that she knew approximately a year after completing chemotherapy that her eyebrows ***had not grown back and were not growing at that time***. Def. Ex. D, Hall Dep. at 211:16–212:6. She did not testify that she realized they "were not going to come back." This is very similar to Sanofi's preference for the term "persistent," instead of permanent. *See* Ex. J, Palatinsky Dep. at 449:1-7, 455:1-456:25. |
| 9. If Dr. Auerbach could go back to March 2010, he would still recommend Taxotere and Cytoxan to Ms. Hall. Def. Ex. E, Auerbach Dep., at 53:18–22. | This statement is incomplete and misleading. Dr. Auerbach testified that if he "was back in 2010" he would still recommend Taxotere and Cytoxan to Ms. Hall "based on the knowledge [he] had then." Def. Ex. E, Auerbach Dep., at 53:18–22. This testimony is meaningless. |
| 10. If the Taxotere package insert included the phrase, "cases of permanent alopecia have been reported," this warning would not have materially changed the way Dr. Auerbach assessed Taxotere from a risk-benefit perspective. Def. Ex. E, Auerbach Dep., at 72:17–73:11. | This statement is incomplete and misleading. Dr. Auerbach testified further that "[t]he patient always had the final word, in my practice at least," and if a patient was not comfortable with Taxotere's risks, including permanent alopecia, he would have used "another alternatively acceptable regimen." Def. Ex. E., Auerbach Dep., at 73:12-18. |

4

## PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS

Plaintiff provides the following additional material facts in support of her Response in Opposition to Sanofi's Motion for Summary Judgment. Although Sanofi was unwilling to include these facts in the Joint Statement of Undisputed Facts, each is relevant, accurate, and supported by citations to the records.

1. Prior to receiving chemotherapy treatment, Ms. Hall performed research into chemotherapy and the risks of chemotherapy. Ex. I, Hall Dep. at 162:24-163:4, 174:12-175:8.

2. Based on her own research and her discussions with Dr. Auerbach, Ms. Hall understood most of the risks of chemotherapy, including hair loss, to be temporary. Ex. I, Hall Dep. at 174:12-175:8.

3. In addition to Taxotere, Ms. Hall was also administered another chemotherapy drug, Cytoxan (cyclophosphamide), as a part of her chemotherapy regimen. Def. Ex. G, PFS § V.12.

4. The Taxotere labeling in effect at the time that Ms. Hall was administered Taxotere from March 11, 2010 to June 24, 2010 contained the same language about hair as the original 1996 labeling. Ex. L, 2007 Taxotere Labeling. This labeling did not contain any warning of persistent or permanent alopecia or hair loss. *Id.*; see also Ex. J, Palatinsky Dep. 223:3-8; 408:10-19.

5. Sanofi knew about reports of irreversible hair loss in Taxotere users by 2006. Ex. J, Palatinsky Dep. 552:23-553:4.

6. A Sanofi study, known as TAX316, demonstrated by 2008 that the rate of permanent alopecia in the study's Taxotere patient group was double the rate in the non-Taxotere patient group. Ex. M, Expert Report of Dr. Laura Plunkett, at pgs. 27-28.

7. Although known to Sanofi, the TAX316 study findings were not included in the Taxotere labeling in effect at the time that Ms. Hall was administered Taxotere. Ex. J, Palatinsky Dep. 394:13-17.

8. Sanofi knew in 2006 that Taxotere could cause irreversible alopecia. Ex. N, Freedman Dep. 195:20-196:2.

9. In 2010, Sanofi hired a company called InTouch Solutions to monitor Sanofi's Facebook page, remove all posts about permanent hair loss, and ban the user from posting on Sanofi's Facebook page. Ex. O, Fierro Dep. 158:21-159:7.

10. Ms. Hall has taken sixteen different medications that are potentially linked to alopecia since completing chemotherapy. Ex. I, Hall Dep. at 216:18-2:18-22. These drugs include Arimidex, a long-term hormone therapy, prescribed to Ms. Hall from 2010 until at least 2017. Ex. P, Brandon Cancer Center Medical Record. She did not know whether or not these drugs had an effect on the lack of regrowth of her eyebrows. Ex. I, Hall Dep. at 220:20-25.

11. Prior to seeing an advertisement on television regarding Taxotere lawsuits in 2016, Ms. Hall did not understand that Taxotere, as opposed to chemotherapy generally, caused the lack of regrowth of hair she experienced after undergoing chemotherapy. Prior to this point, Ms. Hall also did not have any knowledge that Taxotere had a risk of causing permanent hair loss or that the manufacturer of Taxotere knew about this risk prior to the time that she was administered Taxotere. Ex. Q, Margaret Hall Affidavit.

12. Prior to seeing an advertisement on television regarding Taxotere lawsuits in 2016, Ms. Hall did not understand that her hair, including on her head and eyebrows, would not grow any further. She knew that it had not grown back fully up to that point in time, but

did not know that it would never come back and had not given up hope that she would experience additional regrowth. No physician ever told her that her hair or eyebrows would not grow more or that she had "permanent" alopecia or hair loss. Ex. Q, Margaret Hall Affidavit.

13. Ms. Hall first retained an attorney to investigate a potential claim against Sanofi alleging permanent hair loss caused by Taxotere on March 3, 2018. Ex. R, Redacted Attorney-Client Retainer.

14. Ms. Hall underwent permanent tattooing on her eyebrows within the year prior to her deposition, which occurred on November 2, 2022. Ex. I, Hall Dep., at 212:7-12.

15. If the Taxotere labeling in effect in 2010 had warned of permanent hair loss, Dr. Auerbach would have conveyed that warning to Ms. Hall. Ex. S, Auerbach Dep. at 72:17-73:4.

16. If Dr. Lewis Auerbach had told Ms. Hall that Taxotere carried a risk of permanent hair loss, Ms. Hall would have asked him about other chemotherapy options. Ex. Q, Margaret Hall Affidavit.

17. Ms. Hall testified that she would have wanted to know about the risk of permanent hair loss in 2010, and that she would have chosen an equally effective alternative chemotherapy regimen in light of that information. Ex. I, Hall Dep., at 191:10-192:7.

18. If Ms. Hall had requested an alternative chemotherapy regimen in 2010, Dr. Auerbach would have prescribed Adriamycin, instead of Taxotere. Ex. S, Auerbach Dep., at 46:17-47:3. Dr. Auerbach testified further that he did not see anything in Ms. Hall's medical records that would have prevented her from receiving Adriamycin as part of her

    chemotherapy regimen, and that she could have been prescribed Adriamycin and Cytoxan instead of Taxotere and Cytoxan if she had not wanted to receive Taxotere. *Id.* at 82:6-18.

19. If Dr. Auerbach had presented Ms. Hall with another chemotherapy option that did not have the same risk of permanent hair loss as Taxotere, and that was, in his opinion, equally effective, Ms. Hall would have elected to receive that alternative option instead of Taxotere. Ex. Q, Margaret Hall Affidavit.

## **LEGAL STANDARD**

Sanofi has provided a fair recitation of the summary judgment standard, but neglected to include that the Court must resolve all reasonable inferences in favor of the non-moving party. *See, e.g.*, *Berbridge v. Sam's East, Inc.,* 728 Fed. Appx. 929, 930 (11th Cir. 2018). The Court should not grant summary judgment unless it is clear that a trial is unnecessary, and any doubt as to the existence of a genuine issue of fact should be resolved in favor of the non-moving party. *Celotex v. Catrett*, 477 U.S. 317, 330 fn. 2 (1986). Finally, the only case that matters to the present motion is Ms. Hall's case. Sanofi devotes more than five pages of its brief to a discussion of MDL and MCL rulings, none of which apply Florida law. In fact, of the 237 statute of limitations dismissals cited by Sanofi, 223 arose from one motion applying Mississippi law, which does not contain a discovery rule. The Court's analysis in the present case should be limited to the facts of Ms. Hall's case and the application of Florida law to those facts.

## **ARGUMENT**

Ms. Hall could not have reasonably discovered facts giving rise to her cause of action until approximately 2016 when she saw a television advertisement regarding Taxotere lawsuits. This was the point at which she first began to realize that Taxotere had caused her to experience *permanent* hair loss. In fact, Sanofi did not publically acknowledge Taxotere's risk of permanent

hair loss until December 2015, even though it was fully aware of this risk beginning in 2006. As such, neither Ms. Hall nor her doctor were aware of this risk at the time of her chemotherapy treatment or in the years after she completed treatment. Therefore, Ms. Hall's lawsuit against Sanofi was filed timely in October 2019, less than four years after she realized Taxotere had caused her permanent hair loss and the date on which Sanofi changed its Taxotere labeling to warn of permanent hair loss.

The learned intermediary doctrine also does not justify summary judgment in Ms. Hall's case. Ms. Hall's oncologist, Dr. Auerbach would have conveyed the risk of permanent hair loss if Sanofi had given him that information. If aware of that risk, Ms. Hall would have requested other chemotherapy options and would have chosen an equally effective alternative option. Finally, Dr. Auerbach would have prescribed Adriamycin instead of Taxotere if Ms. Hall had requested a non-Taxotere regimen, so a non-Taxotere alternative option was available. Therefore, Ms. Hall has established proximate causation under the learned intermediary doctrine.

### I. Ms. Hall's claims are not barred by Florida's four year statute of limitations because she did not and could not have reasonably discovered facts giving rise to her cause of action until 2016.

Florida's four year statute of limitations on products liability claims begins to run when the plaintiff discovers or should discover facts giving rise to the cause of action. Fla. Stat. §§ 95.031(2)(b); *Carter v. Brown & Williamson Tobacco Corp.*, 778 So. 2d 932, 936 (Fla. 2000). The Florida Supreme Court has stated that "there is no magic moment when [the point when the facts giving rise to the cause of action are known or should have been known by the plaintiff] arrives as we often deal here with inherently debatable questions about which reasonable people may differ." *Carter v. Brown & Williamson Tobacco Corp.*, 778 So. 2d at 937 (quoting *Celotex Corp. v. Copeland*, 471 So. 2d 533, 539 (Fla. 1985). As a result, the Florida Supreme Court

continued, the question of when a statute of limitations begins to run in a products liability case is generally a question of fact for a jury to resolve, and is "therefore inappropriate for resolution on a summary judgment…." *Id.*

Based on her own research and Dr. Auerbach's guidance, Ms. Hall always understood chemotherapy to contain a risk of temporary hair loss. Plaintiff's Statement of Additional Material Fact ("PSAMF") ¶¶1-2, 11. In fact, Sanofi's label expressly told patients that their hair would grow back. Response to Sanofi's Statement of Additional Material Facts ("RSSAMF"), ¶1; PSAMF ¶4. Therefore, it is not surprising that Ms. Hall held on hope that her hair and eyebrows would continue to grow back, eventually to the fullness they had prior to beginning chemotherapy. PSAMF ¶¶11-12. There is nothing in the records to indicate that Ms. Hall believed her hair loss was permanent prior to 2016 or that she believed Taxotere, specifically, caused her lack of hair regrowth, as opposed to chemotherapy, generally.

However, Ms. Hall did eventually lose her hope for full regrowth when she saw a television advertisement regarding Taxotere lawsuits in 2016 and hired an attorney to pursue her claim in 2018. PSAMF ¶¶11-13. It was not until after she retained an attorney that Ms. Hall decided to undergo permanent tattooing on her eyebrows, a fact from which a reasonable juror could infer that she did not give up hope on further regrowth until much later than Sanofi argues. PSAMF ¶14.

Sanofi argues that Ms. Hall should have known that her hair loss was "permanent" when it did not grow back fully within six months. However, according to Ms. Hall's testimony, her hair was continuing to regrow a full year after she completed chemotherapy, undermining any argument for a firm six month definition. RSSAMF ¶7. Despite Sanofi's urging, there is no established timeframe when alopecia becomes "permanent." RSSAMF ¶3. Of course, there may

be minimum time periods that must lapse before a doctor can consider hair loss permanent, but this does not mean that the minimum period is an absolute marker of permanence. Sanofi's own employees prefer to call long-lasting alopecia "persistent alopecia," because "permanent" implies knowledge of the ultimate outcome. *Id*. Similarly, Ms. Hall knew her hair loss was continuing, but did not and could not know it was permanent – i.e. that it would never grow back. However, even assuming arguendo that the medical community agreed that hair loss is always permanent after six months, Ms. Hall is not a doctor and does not have an understanding of alopecia, permanent alopecia, or the timeframes that apply to these terms. Therefore, any such definition cannot trigger her statute of limitations.

Sanofi references a CBS News article published before Ms. Hall underwent chemotherapy treatment and medical articles about the link between Taxotere and hair loss in support of its argument that Ms. Hall could have learned about Taxotere's risk of permanent hair loss by researching the issue. However, Ms. Hall testified that she did research the risks of Taxotere and found no information about the risk of permanent hair loss. *See* PSAMF ¶1-2. If the information was so readily accessible, as Sanofi claims, Ms. Hall would have found it. Indeed, this line of argument is a bold choice for Sanofi, considering that Sanofi knew about Taxotere's risk of permanent hair loss as early as 2006, and chose not to disclose this risk in its labeling until the FDA forced it to do so in 2015. PSAMF ¶¶5-8. In fact, Sanofi actively suppressed information about the link between Taxotere and permanent hair loss during the timeframe that it claims Ms. Hall should have discovered her cause of action through independent research. PSAMF ¶9. Sanofi's claim that Ms. Hall should have independently discovered that Taxotere has a risk of permanent hair loss, when Sanofi withheld and even suppressed this same information for more than nine years, is unreasonable.

The question of when the limitations period began to run is further complicated by the multi-faceted nature of chemotherapy treatment. Ms. Hall did not receive Taxotere in a vacuum, but instead received it in conjunction with Cytoxan. PSAMF ¶3. She also has received numerous other medications that can affect hair regrowth, including Arimidex, which was prescribed to her immediately following chemotherapy until at least 2017. PSAMF ¶10. While she testified that she believed her chemotherapy caused her hair loss and subsequent lack of regrowth by the time she hired an attorney, there were other potential causes of her lack of hair regrowth in the years following chemotherapy. In fact, a reasonable person could believe that Arimidex was a likely cause of the lack of regrowth, up until Ms. Hall stopped taking that medication sometime after 2017. The same inference could reasonable be made about any of the other drugs that Sanofi asked Ms. Hall about in her deposition. Additionally, since Ms. Hall's understanding was that Taxotere would only cause temporary hair loss, and Sanofi's labeling expressly stated this, it was reasonable for her to believe that something else besides Taxotere was delaying her hair regrowth.

Ms. Hall's case is analogous to *Eghnayem v. Boston Sci. Corp*, a transvaginal mesh products liability case in which the Court denied a renewed motion for judgment as a matter of law on statute of limitations grounds. 2016 WL 4051311, at *38-40 (M.D. Fla. March 17, 2016). The *Eghnayem* plaintiff testified that she believed "the mesh repair," which occurred more than four years before her suit was filed, caused her injuries. *Id.* at *38. The Court held that this admission did not trigger the statute of limitations, because there was no evidence that the plaintiff knew the transvaginal mesh product itself caused her injuries. *Id*. at *39. Similarly, Ms. Hall knew that chemotherapy caused her initial hair loss and she ultimately came to believe that chemotherapy treatment, generally, caused her hair loss and lack of regrowth. However, she did

12

not suspect that Taxotere specifically caused these problems, and therefore, did not appreciate that she had experienced an actionable injury – i.e. permanent hair loss caused by Taxotere, specifically. Therefore, the statute of limitations was not triggered.

Prior to 2016 Ms. Hall did not know Taxotere had caused her to sustain permanent hair loss. Prior to Sanofi's December 2015 label change, she could not have reasonably discovered this fact, which was critical to her causes of action against Sanofi. In fact, until December 2015, Sanofi's only disclosure was that patient's hair would grow back. Without knowledge of an actionable injury, the statute of limitations was not triggered.

Sanofi urges a "magic moment" at which Ms. Hall should be charged with the requisite knowledge to trigger the statute of limitations, but the Florida Supreme Court has criticized this type of analysis. Since reasonable people could differ in answering these debatable questions, the jury should resolve the question of when the statute of limitations began to run in this case. *See Carter v. Brown & Williamson Tobacco Corp.*, 778 So. 2d at 937.

### II. The learned intermediary doctrine does not foreclose Ms. Hall's failure to warn claim because she would not have received Taxotere if Sanofi had disclosed the risk of permanent hair loss in its 2010 Taxotere labeling.

In order to prevail on a failure to warn claim against a drug's manufacturer, a plaintiff must present evidence her doctor would not have prescribed the drug if the manufacturer had provided an adequate warning. *Hoffman-La Roche Inc. v. Mason*, 27 So. 3d 75, 77 (Fla. Dist. Ct. Ap. 2009); *Salinero v. Johnson v. Johnson*, 995 F. 3d 959, 964 (11th Cir. 2021). Thus, the question is one of proximate causation. *Id.*; *see also Eghnayem v. Boston Sci. Corp*, 2016 WL 4051311, at*34.

In the present case, the evidence clearly establishes that Ms. Hall would not have received Taxotere if Sanofi had provided adequate warnings about permanent hair loss. Dr.

13

Auerbach testified that he would have conveyed a risk of permanent hair loss to Ms. Hall if Sanofi had provided information about this risk to him. PSAMF ¶15. Dr. Auerbach testified further that "[t]he patient always had the final word, in my practice at least," and if a patient was not comfortable with Taxotere's risks, including permanent alopecia, he would have used "another alternatively acceptable regimen." RSSAMF ¶10. In Ms. Hall's case, he would have prescribed Adriamycyn instead of Taxotere. PSAMF ¶18. Completing this chain of causation, Ms. Hall would have requested an alternative chemotherapy regimen if she had known of the risk of permanent hair loss, and she would have elected to receive that alternative if it were equally effective. PSAMF ¶¶16-17, 20. Therefore, if Sanofi had provided an adequate warning to Dr. Auerbach, Ms. Hall would never have received Taxotere, and thus would not have experienced permanent hair loss.

  Sanofi confuses the proximate cause question by arguing, almost exclusively, that an adequate warning would not have changed Dr. Auerbach's risk-benefit analysis of Taxotere. However, this omits patient choice from the causal chain, and Dr. Auerbach clearly testified that a patient's choice is ultimately the deciding factor. Ms. Hall is not an animal or inanimate object on whom Dr. Auerbach could impose any treatment he deemed appropriate. Instead, she is a human being who is entitled and required to provide informed consent before receiving a drug. Ultimately, it was Ms. Hall's choice whether to receive Taxotere. Prescribing a drug that a patient will not agree to receive would be futile, so it is critical to consider the patient's consent and choice in the learned intermediary proximate causation analysis.

  The record establishes that Ms. Hall would not have received Taxotere if Sanofi had warned of the risk of permanent hair loss. As a result, proximate causation is established and summary judgment on Ms. Hall's failure to warn claim is not appropriate.

## **CONCLUSION**

Neither the statute of limitations nor learned intermediary doctrine warrant summary judgment in this case.

Ms. Hall did not and could not have reasonably discovered facts giving rise to her cause of action until approximately 2016 when she saw a television advertisement regarding Taxotere lawsuits and began to understand that Taxotere had caused her to experience *permanent* hair loss. Sanofi did not disclose to the public Taxotere's risk of permanent hair loss until December 2015, so an examination of the Taxotere labeling would not have revealed any information about this risk prior to December 2015. In fact, Sanofi withheld and suppressed information about the risk, even though they now argue that Ms. Hall should have discovered this information on her own. Ms. Hall filed her lawsuit against Sanofi less than four years after she realized Taxotere had caused her permanent hair loss and the date on which Sanofi finally changed its Taxotere labeling to warn of permanent hair loss.

The learned intermediary doctrine also does not justify summary judgment in Ms. Hall's case. Ms. Hall's oncologist, Dr. Auerbach, would have conveyed the risk of permanent hair loss if Sanofi had given him that information. If aware of that risk, Ms. Hall would have requested other chemotherapy options and would have chosen an alternative option. Sanofi urges the Court to ignore Ms. Hall's right to participate in her medical decision-making, and argues that only Dr. Auerbach's risk-benefit analysis is relevant. Instead, it is clear from Dr. Auerbach's testimony that Ms. Hall's patient choice is a critical part of forming a chemotherapy plan, and Ms. Hall's choice would have been to avoid Taxotere altogether.

Finally, Dr. Auerbach would have prescribed Adriamycin instead of Taxotere if Ms. Hall had requested a non-Taxotere regimen, so Ms. Hall never would have received Taxotere if

Sanofi had provided an adequate warning about permanent hair loss. If she never received Taxotere, she would not have experienced permanent hair loss. Therefore, Ms. Hall has established proximate causation under the learned intermediary doctrine.

For these reasons, Sanofi's Motion for Summary Judgment should be denied.

Dated: September 1, 2023

/s/Trevor B. Rockstad
Trevor B. Rockstad (MSB No. 103614)
(Admitted *Pro Hac Vice*)
DAVIS & CRUMP, P. C.
2601 14th Street
Gulfport, Mississippi 39501
Telephone: (228) 863-6000
Facsimile: (228) 864-0907
trevor.rockstad@daviscrump.com

J. Robert Bell III, Esq.
Joseph A. Osborne, Esq.
Osborne & Francis, PLLC
925 S. Federal Hwy., Suite 175
Boca Raton, FL 33432
Tel: (561) 293-2600
Fax: (561) 923-8100
josborne@realtoughlawyers.com

*Attorneys for Plaintiff Margaret Hall*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on September 1, 2023, a true and correct copy of the foregoing was filed through the CM/ECF system, which will serve an electronic copy on all counsel of record.

/s/ Trevor B. Rockstad
Trevor B. Rockstad
Counsel for the Plaintiff
